UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
---------------------------------------------------------------- X
JULIE FERRO,

                        Plaintiff,                    Civil Action No.: 20-23449(BB)

      v.

DOCTORS HEALTHCARE PLANS, INC., and      **SECOND AMENDED**
RAFAEL PEREZ, in his individual and professional    **COMPLAINT**
capacities,

                                                     **Jury Trial Demanded**

                        Defendants.
----------------------------------------------------------------X

Plaintiff Julie Ferro hereby alleges as follows:

## PRELIMINARY STATEMENT

1. Founded in 2017, Defendant Doctors HealthCare Plans, Inc. ("Doctors HealthCare" or the "Company") is a local health insurance plan offering Medicare coverage in Miami-Dade County.

2. Despite Doctors HealthCare claiming in its logo, "Your Health, Our Commitment," the Company and its founder and Chief Executive Officer, Defendant Rafael Perez, callously terminated Ms. Ferro, the former Vice President of Provider Relations, due to her underlying immunocompromised medical condition and because she needed related accommodations and leave.

3. Ms. Ferro is an accomplished healthcare executive with over 30 years of experience managing Medicare and Medicaid insurance programs in the state of Florida who joined Doctors HealthCare as only its third employee.

4. Over the last few years, Ms. Ferro helped grow the Company to over 100 employees, more than 2,500 providers, and close to 10,000 members.

5. Unfortunately, Ms. Ferro's tireless work did not matter after she began dealing with several medical issues starting in late 2019 related to her chronic inflammatory disorder and autoimmune compromised condition.

6. The COVID-19 pandemic further brought to the forefront Ms. Ferro's medical issues given the CDC's warnings to "people of any age with serious underlying medical conditions" to stay home to avoid contracting the deadly virus.

7. While Ms. Ferro understandably became concerned about what would happen if she contracted COVID-19, Mr. Perez stated at a staff meeting that he believed the virus was being made more of an issue because it is an election year and expressed in various ways his reluctance to have employees work remotely.

8. Ultimately, Ms. Ferro was permitted to work from home, after being required to provide a doctor's letter, but she was told that she had to have two of her staff members physically at the office.

9. After a couple of months working from home, Mr. Perez pressured Ms. Ferro to return to the office with the rest of the employees on May 26, 2020.

10. When Ms. Ferro returned to the office, she was shocked that most employees were not wearing masks or observing social distancing.

11. She also noticed that the office lacked paper towels and sanitary products in the kitchen and bathrooms.

12. On one occasion, Ms. Ferro texted Mr. Perez to tell him that she was going to work from home and her subordinate, who lived with her elderly mother, would work in her office since there was "no adequate distancing" where she worked.

13. Mr. Perez responded that Ms. Ferro was "the one with the office and not them," which caused Ms. Ferro to return to the office.

14. In late May and early June, and the number of COVID-19 cases quickly began to rise as businesses and public gathering places in Florida reopened quickly, and seemingly prematurely.

15. On June 4, 2020, Florida broke its record for a single-day high of newly reported cases of COVID-19, with 1,419 new cases, and the state continued to report near record highs over the next few days.

16. Mr. Perez unquestionably appeared concern that he would have to further accommodate Ms. Ferro's medical condition due to the spike in COVID-19 cases, and he had already become annoyed by Ms. Ferro's medical issues and FMLA-eligible leave.

17. As a result, on Monday, June 8, 2020, Mr. Perez abruptly called Ms. Ferro into his office and told her that she was being let go because "things were not working out."

18. Ms. Ferro was shocked by this, given that she had been a loyal and dedicated employee, and because she had recently, at the end of 2019, received an excellent performance review and a $25,000 raise.

19. Ms. Ferro questioned Mr. Perez about her termination, but he would give her only vague or transparently false reasons to try to justify her termination, and later even tried to get Ms. Ferro to agree to resign.

20. Ms. Ferro brings this action pursuant to the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq*. ("FMLA") to redress Defendants' unlawful retaliation in violation of the FMLA and redress the Company's unlawful disability and age discrimination in violation of the Title

VII of the Civil Rights Act ("Title VII"), the Americans with Disabilities Act ("ADA") and the Florida Civil Rights Act of 1992 ("FCRA").

## ADMINISTRATIVE PREREQUISITES

21. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), which was cross-filed with the Florida Commission on Human Relations ("FCHR"), alleging unlawful discrimination in violation of Title VII, the ADA and the FCRA.

22. Plaintiff received a Notice of Right to Sue from the EEOC and seeks leave amend to include her Title VII and ADA claims in this action within 90 days of receipt of the Notice of Right to Sue.

23. Pursuant to FCRA § 760.11(8), 180 days has passed since she cross-filed her EEOC Charge with the FCHR and no determination on whether probable cause exists has been made, and Plaintiff seeks leave to amend to include her FCRA claims in this action.

24. Plaintiff has complied or will comply with any and all other prerequisites to filing this action.

## JURISDICTION AND VENUE

25. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under the FMLA, Title VII and the ADA. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

26. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including employment practices alleged herein, occurred in this district.

## PARTIES

27. Plaintiff Julie Ferro is a former Vice President of Provider Relations at Doctors HealthCare Plans, Inc. Ms. Ferro is a resident of the state of Florida and, at all relevant times herein, met the definition of an "employee" and/or "covered employee" under all relevant statutes.

28. Defendant Doctors HealthCare Plans, Inc. is a Florida profit corporation registered at 2020 Ponce de Leon Boulevard, Suite PH 1, Coral Gables, FL 33134. In its filings with the Florida Division of Corporations, Doctors HealthCare lists Mr. Perez as its President and CEO. At all times relevant herein, Doctors HealthCare was and is an "employer" under all relevant statutes.

29. Defendant Rafael Perez is a resident of the state of Florida, is the President and CEO of Doctors HealthCare, supervised Plaintiff during her employment at the Company, determined Plaintiff's pay and made the decision to hire and fire Plaintiff. At all relevant times, Defendant Perez met the definitions of "employer" and/or "covered employer" under all applicable statutes.

## FACTUAL ALLEGATIONS

**I.   Ms. Ferro's Professional Background and Work at Doctors HealthCare**

30. Ms. Ferro is an accomplished healthcare executive with over 30 years of experience managing Medicare and Medicaid insurance programs in the state of Florida.

31. In the early 1980s, Ms. Ferro worked at Humana, where Ms. Ferro was responsible for managing the insurer's provider relationships.

32. Ms. Ferro also gained substantial experience working in a provider relationship and business development role for the healthcare providers Jackson Memorial Health Plans, Physician Healthcare Plans, Inc., and LogistiCare.

33. Around 2002, Mr. Perez contacted Ms. Ferro to recruit her to work at Mr. Perez's healthcare insurance startup, Medica Health Care Plans, Inc. ("Medica"), given her knowledge and experience.

34. Ms. Ferro was one of the very first employees at Medica, and served in the vital role of Director of Provider Relations. Ms. Ferro worked tirelessly for a decade to help Medica grow its providers and members.

35. In February 2012, Medica was sold to UnitedHealth Group for $400 million.

36. Ms. Ferro remained working at Medica under the UnitedHealth Group leadership.

37. However, in August 2013, Ms. Ferro decided to stop working to focus on her escalating health issues that were later diagnosed as rheumatoid arthritis, a chronic condition that requires periodic visits for treatment by a health care provider and causes recurring symptoms and episodic and continuing periods of incapacity.

38. In late 2008, Ms. Ferro developed a serious case of the shingles that required her to be hospitalized in intensive care for five days. In the months leading up to the sale of Medica in 2012, Ms. Ferro also shared with Mr. Perez that she was starting to feel fatigued, had pain in her joints, and that on multiple occasions her knees would start to buckle and she would almost fall.

39. After about six months of not working at all and focusing on her health, in 2014, Ms. Ferro started working as an independent consultant for several management services organizations and other healthcare entities. This included work for Mr. Perez's son, Gabriel

Perez, who Ms. Ferro helped to secure a major account that was expected to generate about $1 million a year in revenue.

40. Around January 2017, Mr. Perez approached Ms. Ferro about working for him to help launch another start-up health plan in Miami-Dade County specializing, like Medica, in Medicare coverage.

41. At the time Mr. Perez discussed this opportunity, Mr. Perez repeatedly asked Ms. Ferro how she was feeling and whether she would be able to commit to work on a full-time basis.

42. Ms. Ferro, whose health issues were under control at the time, responded that she was doing well and was committed to working full-time.

43. Ms. Ferro was only the third employee for the new business at the time, and worked tirelessly to launch Doctors HealthCare on January 1, 2019.

44. The Company has been growing rapidly ever since, and now has over 100 employees, more than 2,500 providers, and close to 10,000 members.

## II.     Ms. Ferro's Health Issues Return

45. Ms. Ferro was able keep her health issues under control for the first couple of years at the Company.  However, during a trip to see her daughter in Virginia for Thanksgiving last year, Ms. Ferro had to visit the emergency room because she developed a growth on the side of her mouth.  Ms. Ferro was prescribed an antibiotic to treat the growth and was discharged.

46. After returning to Florida, Ms. Ferro woke in the middle of the night on the Sunday after Thanksgiving to find that the left side of her face had hardened, and she decided to go to the emergency room.

47. At the hospital, Ms. Ferro was given a different antibiotic that caused her immune system to go into shock, which resulted in her being intubated.

48. Ms. Ferro's husband promptly informed Mr. Perez about Ms. Ferro's unforeseeable medical symptom, including the fact that Ms. Ferro was hospitalized and admitted to the Intensive Care Unit because of complications with her treatment.

49. Ms. Ferro was in the hospital for a week and Mr. Perez was aware that Ms. Ferro need to take leave because of her hospitalization.

50. After Ms. Ferro was discharged, Mr. Perez also was aware that Ms. Ferro needed to stay home for two weeks to recover while she periodically continued to do her work for the Company when she was able to do so.

51. During that time, Ms. Ferro regularly kept Mr. Perez updated on the status of her medical condition and continued treatment.

52. Although Defendants had more than sufficient notice of Ms. Ferro's hospitalization and serious medical condition to determine that she qualified for FMLA leave, Defendants failed to designate Ms. Ferro leave as FMLA leave or apprise Ms. Ferro of her rights under the FMLA.[1]

---

[1] Defendants cannot place the burden on Ms. Ferro to designate her leave as FMLA-eligible. "Once an employee has notified an employer that he or she may qualify for leave under the FMLA, *the employer is obligated* to provide three types of notice: eligibility notice, which requires the employer to inform the employee whether she is eligible to take FMLA leave; rights and responsibilities notice, which requires the employer to inform the employee of any obligations or responsibilities the employee may have under the employer's leave policy (i.e., a requirement to provide a doctor's certification); and designation notice, which requires the employer, once it has sufficient information about the request, to inform the employee if the leave requested with be designated as FMLA-qualifying. 29 C.F.R. § 825.300(b)-(d)." Canigiani v. Banc of Am., 17 Civ. 61270, 2017 WL 4390170, at *3 (S.D. Fla Oct. 3, 2017) (Bloom, J.) (emphasis added). Instead of doing what was required, Defendants took adverse employment actions against Ms. Ferro because she took FMLA-eligible leave.

53. Had she been advised of her rights under the FMLA, Ms. Ferro likely would have taken additional leave, or requested intermittent leave, and would not have been so anxious about being out of work.

54. On December 24, 2019, Ms. Ferro returned to work.

55. At that time, Mr. Perez was aware that Ms. Ferro was still under the care of her physician and that she needed to monitor her health and progress while working.

56. For the next several weeks, Ms. Ferro continued to experience health issues in part due to the medication, Enbrel, which she was taking to treat her rheumatoid arthritis.

57. Ms. Ferro frequently became nauseous and would need to rush to the bathroom to throw up, including one time during a meeting where Mr. Perez were present.

58. On at least two occasions, Ms. Ferro informed Mr. Perez that she could not attend a meeting or would be late because she was suffering from headaches or stomach pain.

59. During one conversation, Ms. Ferro disclosed that she was taking Enbrel, and since Mr. Perez has a pharmacy background, Mr. Perez told her that the side effects are similar to a medication that Mr. Perez's wife was taking for Crohn's disease, and that she also was immunocompromised.

60. During another conversation about Ms. Ferro's ongoing medical issues, Mr. Perez told her that, "There is always something with you."

61. Mr. Ferro also noticed that Mr. Perez appeared irritated and crass towards her and got annoyed that she also notified his assistant about her medical issues and related absenteeism or tardiness.

62. In addition to commenting upon her health issues and their impact on Mr. Perez's impression of her, Mr. Perez also frequently made pointed disability-related and ageist remarks

to Ms. Ferro, who turned 60 in March, including about how much they have both aged and are not as young and healthy as they used to be.

63. In mid-February 2020, Ms. Ferro began to feel disoriented and fatigued, but continued to work through the symptoms until one day when the Company's Medical Director, Andres Prieto, M.D., noticed that Ms. Ferro was flushed around her neck and chest.

64. Dr. Prieto checked Ms. Ferro's blood pressure and told her that she should go and see her physician because the symptoms were abnormal.

65. Dr. Prieto even called her physician's office to inform them that Ms. Ferro was on her way and it was an urgent matter.

66. Ms. Ferro again worked from home for a couple of days until her blood pressure started to return to normal, but it still took a few weeks for Ms. Ferro to get her blood pressure fully under control.

67. Ms. Ferro was also instructed to follow up with her rheumatologist and dermatologist to address skin-related symptoms of psoriatic arthritis.

68. Ms. Ferro kept Mr. Perez informed about her medical treatment, condition, and need for further medical evaluation during their regular conversations.

69. When active, Ms. Ferro's rheumatoid arthritis substantially limits the functions of her immune and digestive system and her ability to walk, stand, and concentrate. Ms. Ferro also has psoriatic arthritis that when active affects the sole of her foot and substantially limits her ability to walk and stand.

**III.    The COVID-19 Pandemic**

70. In March 2020, the COVID-19 pandemic began to sweep through the United States in earnest and became a public health crisis.

71. Mr. Perez initially dismissed the virus as a simple case of the flu and claimed that the state of emergency was unnecessary.

72. Incredibly, Mr. Perez told Ms. Ferro and other employees at a staff meeting that, essentially, the government warnings and state of emergency declarations were unwarranted, and that the virus was being made more of an issue because it is an election year.

73. On March 16, 2020, the Centers for Disease Control and Prevention ("CDC"), issued an official warning that the elderly and "people of any age with serious underlying medical conditions" should stay home during the pandemic, as they are "particularly at risk for severe illness or death due to COVID-19."

74. Shortly after this warning was issued, Dr. Prieto advised Ms. Ferro to work from home.

75. Ms. Ferro took the rest of the day off (in part because it was her birthday), but she returned to the office the next day because she felt uncomfortable being the only one working from home when the Company had not issued any instructions or guidance to employees on the issue.

76. It took over a week after this public health warning for Mr. Perez and the Company to begin identifying departments and employees that could work remotely.

77. However, the message from Mr. Perez remained clear that there must still be physical coverage in the office for all areas of the Company.

78. In late March 2020, Ms. Ferro spoke with Mr. Perez about her own immunocompromised condition, and identified other employees on her team who may be at risk of severe illness or death if they were exposed to the virus.

79. Mr. Perez told Ms. Ferro that he would be letting her know what to do shortly.

80. A couple of days after this conversation, Dr. Prieto told Ms. Ferro that she needed to work from home because of her immunocompromised condition.

81. Another three members of Ms. Ferro's staff also were permitted to work from home, but, as she had been instructed, Ms. Ferro made sure to have at least two of her other staff members physically stationed in the office, even though they easily could have worked remotely.

82. Despite Mr. Perez's intimate knowledge of Ms. Ferro's history of medical issues, Mr. Perez requested that Ms. Ferro provide a letter from her physician substantiating her need to work from home.

83. On March 30, 2020, Ms. Ferro provided Mr. Perez with a letter from her physician that said:

> This is a letter to confirm that Mrs. Ferro has rheumatoid arthritis. She is immunocompromised due to the medication she takes for her arthritis which is Enbrel. This places her at extremely high risk for having complications with the COVID-19 pandemic. I recommend that she continue to work from home and should self isolate as much as possible because of her increased risk.

84. Ms. Ferro is unaware of any other employees who were required to provide a similar physician letter in order to be permitted to work from home.

85. Ms. Ferro managed all of her responsibilities while working remotely and checked in on the employees who were at the office.

86. On May 15, 2020, Ms. Ferro received a "Performance Bonus payment" for her work during the past year, and which also provided additional support to employees during the pandemic.

87. Ms. Ferro was given the lowest "Performance Bonus payment" among the employees at her level, and upon information and belief, the decision to do so was based on Ms. Ferro's disability, age and having taken a medical leave in late 2019.

88. On or around May 22, 2020, Mr. Perez announced at a telephonic staff meeting that employees would start returning to the office on May 26, 2020, after the Memorial Day holiday.

89. Mr. Perez also explained that if there was any objection to returning to the office it should be raised directly with him, and reassured employees that it would be safe to return to the office.

90. After the meeting, Mr. Perez spoke to Ms. Ferro and asked whether she planned to work in the office.

91. Ms. Ferro responded that she would check with her physician, but based on the conversation, she felt pressured to request that her physician issue a letter clearing her to return even though Mr. Perez was aware that Ms. Ferro's immunocompromised status put her at risk of serious complications and death if she was exposed to the novel coronavirus.

92. On May 26, 2020, Ms. Ferro returned to the office and saw that few employees were wearing masks or observing social distancing.

93. As a result, Ms. Ferro stayed in her office with the door closed. One of the few times that she left her office, Mr. Perez confronted Ms. Ferro near the elevator and questioned Ms. Ferro about her immunocompromised condition and medication in front of Dr. Prieto.

94. Ms. Ferro was brief in her responses, as she felt very uncomfortable being questioned about her medical issues when other employees were nearby and could overhear the discussion.

95. Because of the lack of use of masks and social distancing, Ms. Ferro decided to alternate the use of her office with her Provider Relations Manager, Noelle Pagliery.

96. Ms. Pagliery repeatedly expressed her concern about potential exposure to the virus because she lives with her elderly mother, who also has medical conditions and therefore is at high risk of dying if she were to contract the virus.

97. Ms. Ferro informed Mr. Perez of the office arrangement by text message.

98. On June 1, 2020, Ms. Ferro worked at the office again and continued to observe the lack of masks and social distancing, as well as the fact that the office lacked even basic supplies such as paper towels and sanitary products in the kitchen and bathrooms.

99. On June 2, 2020, after working part of the day in the office, Ms. Ferro texted Mr. Perez that she was leaving to work from home and that Ms. Pagliery would work in her office for the rest of that day and on the next day.

100. Mr. Perez responded abruptly, questioning her as to why this was.

101. Ms. Ferro responded that there was "no adequate distancing" where Ms. Pagliery sat in the office.

102. Sensing that Mr. Perez was annoyed about her leaving, Ms. Ferro asked if Mr. Perez wanted her to go back to the office.

103. After Mr. Perez responded that she was "the one with the office and not them," Ms. Ferro returned to the office and allowed Ms. Pagliery to work from home.

**IV.** **As COVID-19 Cases Rise in Florida, Defendants Abruptly Terminate Ms. Ferro**

104. Businesses and public gathering places in Florida reopened (quickly and seemingly prematurely) in late May and early June, and the number of COVID-19 cases quickly began to rise.

105. On June 4, 2020, the state broke its record for a single-day high of newly reported cases of COVID-19, with 1,419 new cases, and the state continued to report near-record highs over the next few days (a trend which, sadly, has continued well into August 2020).

106. On Monday, June 8, 2020, Mr. Perez called Ms. Ferro into his office and told her that she was being let go because "things were not working out."

107. Ms. Ferro was shocked by the news, given that she had been a loyal and dedicated employee for the many years that she worked for Mr. Perez, and because she had recently, at the end of 2019, received an excellent performance review and a $25,000 raise.

108. In addition, just two weeks before her termination, Ms. Ferro had received a $10,000 performance bonus that Mr. Perez wrote in a letter was a reflection of her "performance, the contributions [she] made, and the goals achieved on behalf of the company during the past year."

109. Ms. Ferro asked Mr. Perez why she was being terminated. Mr. Perez claimed that she had become "very forgetful" and used his hand to gesture a peak and valley – a representation of the ups and downs with her health issues that required her to miss work.

110. Mr. Perez could tell that Ms. Ferro was not satisfied with his answer, and so Mr. Perez then claimed that she had been forgetful about some issues with providers and said, without any detail, that middle management executives had expressed concerns about her.

111. Mr. Perez also falsely accused Ms. Ferro of proposing a final settlement to a provider without authority when Mr. Perez knew she had only asked whether the provider was interested in settling a claim dispute and the provider agreed to consider one.

112. Since Mr. Perez clearly knew what he was doing was wrong, Mr. Perez took care to assure Ms. Ferro that she would retain her stock in the company, said that Mr. Perez would pay her through August 2020, and offered to let her resign.

113. Ms. Ferro told Mr. Perez that it was clear that Mr. Perez had made a final decision, but that she and Mr. Perez knew that she was not being let go for proper reasons.

114. On June 23, 2020, Ms. Ferro received a text from Mr. Perez's administrative assistant asking her for a resignation letter.

115. Ms. Ferro responded that she did not resign from her job.

116. After her termination, Ms. Ferro also received numerous messages from employees and service providers expressing their surprise that Ms. Ferro left Doctors HealthCare and telling her that she would be missed.

117. After her termination, the Company reassigned Ms. Ferro's job responsibilities to Ms. Pagliery, who does not have any known disabilities and is nearly two decades younger than Ms. Ferro.

**FIRST CAUSE OF ACTION**
**(Retaliation in Violation of the FMLA)**
*Against Defendants*

118. Plaintiff repeats, reiterates, and re-alleges each and every allegation in the preceding factual allegations, as though fully set forth herein.

119. At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA. Plaintiff, a full-time employee of Doctors HealthCare, at all relevant times worked at least 1,250 hours in any 12-month period, and specifically did so during the 12-month period preceding her termination.

120. At all times relevant herein, Doctors HealthCare was a "covered employer" within the meaning of the FMLA. Doctors HealthCare employs 50 or more employees during at least 20 calendar weeks over the covered period within a 75-mile radius of the Company.

121. By the actions described above, among others, Defendants have retaliated against Ms. Ferro for taking FMLA leave, including by, *inter alia*, reducing her pay and terminating her employment.

122. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages, liquidated damages, reasonable attorneys' fees and expenses, and other relief.

**SECOND CAUSE OF ACTION**
**(Disability Discrimination in Violation of the ADA and FCRA)**
*Against Doctors HealthCare*

123. Plaintiff repeats, reiterates, and re-alleges the factual allegations set forth in Paragraphs 45-51 and 54-117, as though fully set forth herein.

124. At all relevant times, Plaintiff had a disability within the meaning of the ADA and the FCRA.

125. By the actions described above, among others, Doctors HealthCare discriminated against Plaintiff because of her disability, including by, *inter alia*, reducing her pay and terminating her employment.

126. As direct and proximate result of Doctors HealthCare's unlawful discriminatory conduct in violation of the ADA and the FCRA, Plaintiff has suffered, and continues to suffer lost wages and benefits, emotional distress for which she is entitled to an award of monetary damages.

127. Doctors HealthCare's discrimination was intentional or engaged in with malice or with reckless indifference to Plaintiff's rights for which an award of punitive damages will be sought.

128. Plaintiff also seeks reasonable attorneys' fees and expenses as provided for under the ADA and FCRA.

**THIRD CAUSE OF ACTION**
**(Age Discrimination in Violation of Title VII and FCRA)**
*Against Doctors HealthCare*

129. Plaintiff repeats, reiterates, and re-alleges the factual allegations set forth in Paragraphs 62, 87 and 106-117, as though fully set forth herein.

130. By the actions described above, among others, Doctors HealthCare discriminated against Plaintiff because of her age, including by, *inter alia*, reducing her pay, terminating her employment and transferring her responsibilities to an employee significantly younger than Plaintiff.

131. As direct and proximate result of Doctors HealthCare's unlawful discriminatory conduct in violation of Title VII and the FCRA, Plaintiff has suffered, and continues to suffer lost wages and benefits, emotional distress for which she is entitled to an award of monetary damages.

132. Doctors HealthCare's discrimination was intentional or engaged in with malice or with reckless indifference to Plaintiff's rights for which an award of punitive damages will be sought.

133. Plaintiff also seeks reasonable attorneys' fees and expenses as provided for under the ADA and FCRA.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.     A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States;

B.     An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.     An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, an award of back pay and loss of benefits through the date of trial and front pay and future loss of benefits if the equitable remedies of employment, reinstatement and promotion are not feasible;

D.     An award of liquidated damages in an amount to be determined at trial;

E.     An award of punitive damages in an amount to be determined at trial;

F.     Prejudgment interest on all amounts due;

G.     An award of Plaintiff's reasonable attorneys' fees and costs; and,

H.     Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: April 14, 2021
      Plantation, FloridaRespectfully submitted,

**MORGAN & MORGAN, P.A.**

By: _____
Bryan L. Arbeit, Bar No. 1010329

8151 Peters Rd, 4th Floor
Plantation, FL 33324
Telephone: (954) 694-9610
barbeit@forthepeople.com

*Counsel for Plaintiff*