# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. 20-cv-23449-BLOOM/Louis

JULIE FERRO,

      Plaintiff,

v.

DOCTORS HEALTHCARE PLANS, INC.,
and RAFAEL PEREZ,

      Defendants.

_____/

## ORDER ON MOTION FOR RECONSIDERATION

**THIS CAUSE** is before the Court upon Defendants Doctors Healthcare Plans, Inc.

("DHCP") and Rafael Perez's ("Perez") (together, "Defendants") Motion for Clarification or

Reconsideration. ECF No. [53]. Based on the Court's inherent authority to reconsider interlocutory

orders,[1] the Motion for Clarification or Reconsideration, **ECF No. [53]**, is **GRANTED**. The Order

on Motion for Final Summary Judgment, ECF No. [52], is amended as follows:

Defendants move for Final Summary Judgment, ECF No. [35] ("Motion"). The Court has

carefully reviewed the Motion, all opposing and supporting submissions, including the Response,

ECF No. [41], and Reply, ECF No. [45], the record in this case, the applicable law, and is otherwise

fully advised. For the reasons that follow, the Motion is granted in part.

## I.      BACKGROUND

This case involves a dispute arising from Plaintiff Julie Ferro's ("Plaintiff" or "Ferro")

termination by her employer, DHCP. In the Second Amended Complaint, ECF No. [24], Ferro

alleges that she was terminated as a result of her underlying immunocompromised medical

---

[1] *Flintlock Const. Services, LLC v. Well-Come Holdings*, LLC, 710 F.3d 1221, 1225 (11th Cir. 2013).

condition and her need for related accommodations and leave. As a result, Plaintiff asserts claims against Defendants for retaliation in violation of the Family and Medical Leave Act ("FMLA"), (Count 1), disability discrimination against DHCP in violation of the Americans with Disabilities Act ("ADA") and Florida Civil Rights Act ("FCRA") (Count 2), and age discrimination in violation of Title VII and the FCRA (Count 3).[2]

Defendants have moved for summary judgment on each of Plaintiff's claimsDefendants filed their corresponding Statement of Material Facts, ECF No. [36] ("Defendants' SMF"). Plaintiff filed her Response to Defendants' SMF and additional material facts, ECF No. [42] ("Plaintiff's SMF"), and Defendants filed their Reply to Plaintiff's SMF, ECF No. [46] ("Defendants' SMF Reply").

## II.    MATERIAL FACTS

Based on the parties' respective statements of material facts in support of and in opposition to the Motion, along with the evidence in the record, the following facts are not genuinely in dispute, unless otherwise noted.

### A.    Ferro's background

Ferro has been working in the healthcare industry since 1983. ECF No. [36-5] at 16. She began to work for Perez when he scouted her for a Health Maintenance Organization ("HMO") he founded in the early 2000s called Medica. *Id*. at 25. Ferro and Perez originally met while they were both working at Humana. *Id*. at 25-26. At Medica, Ferro was the director of provider relations. *Id*. at 26. She worked at Medica for approximately ten years. The company was sold to UnitedHealthcare and she thereafter stayed on as the director of provider relations with

---

[2] In her Response, Ferro states that she does not oppose the dismissal of her age discrimination claims, and thus, the Court will enter summary judgment in Defendants' favor on Count 3 of the Second Amended Complaint. *See* ECF No. [41] at 3, n.1 & 19-20.

UnitedHealthcare for a little over a year until she began to experience health issues. *Id*. at 27, 29-30. Ferro was subsequently diagnosed with rheumatoid arthritis ("RA"). *Id*. at 30.

After leaving UnitedHealthcare, Ferro worked as a freelance consultant for healthcare providers, assisting them with their operations and practices. *Id*. at 31. After some time, Perez sought Ferro out again to work at DHCP in 2017. *Id*. at 33. She was recruited to be the vice president of provider relations. *Id*. at 34. At the time, Ferro had no other health conditions other than the RA. *Id*. at 37.

### B. Perez

Perez has a pharmacy degree and an MBA. ECF No. [36-4] at 7. He met Ferro during his time working at Humana in the 1980s. *Id*. at 8. He was co-founder and CEO of Medica, and he recruited Ferro to be director of provider relations. *Id*. at 10.

### C. Ferro's job duties

Ferro has held positions in the provider relations departments at several companies. ECF No. [36-5] at 19. Those departments make sure that healthcare providers associated with the health plans are educated as to the company's policies and procedures. *Id*. When Ferro worked at DHCP, she reported to Perez and had approximately five subordinates. *Id*. at 39. Part of her job initially was performing out in the field and contracting with specific providers. *Id*. at 44. She also ensured that the staff members she supervised were performing out in the field, assisting in resolving issues, and attending meetings. *Id*. at 45. Her job duties included visiting providers in the field to make sure the staff were performing their functions. *Id*. at 48.

As the head of provider relations, Ferro was never given a standard with respect to how often she was expected to be in the office. *Id*. at 46-47. Two subordinates were required to be in the office to attend to phone calls from providers. *Id*. at 47. According to Perez, once DHCP went

live as a company, Ferro's role was to in-service the provider community—to make sure they understood the benefits, and to build a team and ensure that providers were trained and knew how to submit claims. ECF No. [36-4] at 19. Ferro clarifies that her responsibility was to oversee the training and in-servicing. ECF No. [42-1] at 3.

Noelle Pagliery was a manager in the provider relations department, who Ferro hired. ECF No. [36-5] at 57. Ferro still directly managed the people who reported to Pagliery, but she also delegated to Pagliery. *Id*. at 58. Pagliery was responsible for managing the field direct team and in-servicing. ECF No. [36-10] at 14. She also performed as a provider representative both in-house and in the field. *Id*. The other employees in the department were Janelle Perez, Daniel Perez, and Sylvia Darias. *Id*. at 15. Ferro was Pagliery's supervisor. *Id*. at 18. When Ferro took time off, Pagliery was the acting supervisor. ECF No. [36-5] at 72.

### D.  Health issues and missed work

While working at DHCP, Ferro suffered primarily from RA, complicated with psoriatic arthritis. ECF No. [36-5] at 97. She also had high blood pressure and anxiety. *Id*. Ferro testified at her deposition that she also is generally immunocompromised. *Id*. at 98. According to Ferro, RA is chronic, progressive, and episodic. *Id*. at 100. There were days that she felt well, and then episodes when she experienced overwhelming fatigue, swelling of the joints, stiffness, and overreactive skin. *Id*. The RA impacted her work at DHCP because of the fatigue, and she would have episodes of vomiting in the office, general malaise, and pain. *Id*. at 102. Toward the end of her time at DHCP, the progression of the disease seemed to be more rapid. *Id*. at 103. The RA impacted her ability to do her job in the level of energy she had on some days. *Id*. at 103. She takes Enbrel for the RA, and Meloxicam to help with the stiffness and swelling. *Id*. at 104, 106. Ferro testified that RA limits her mobility in her personal life. *Id*. at 111. She also has periods of fogginess

when she cannot concentrate as much as she would like. *Id*. She used to be able to run, but she cannot anymore, and now after two miles of walking, she begins to feel pain. *Id*. at 112.

When Ferro missed work due to her health, she would alert her office, but did not necessarily tell them that it was RA. *Id*. at 107. She would call Perez directly or call his assistant Elba Reyes. *Id*. at 108.

In December 2019, Ferro suffered an adverse drug reaction. *Id*. at 256–57. She went to the emergency room, where she was intubated, put in the ICU, and hospitalized for five to six days. *Id*. at 257-58. Ferro's husband contacted Perez to let him know. ECF No. [36-4] at 62–63. Perez testified that he was very concerned, and told Ferro not to worry about anything, to take as much time as she needed, and to come back when she was ready. *Id*. at 65. Ferro disputes that Perez told her to take as much time as she needed. ECF No. [42-1] at 8. Perez testified that he had no knowledge at the time of any other health issues with respect to Ferro. ECF No. [36-4] at 69. According to Perez, once Ferro returned to work, she never mentioned anything further about her health, other than that she was fine. *Id*. at 70–71. She did not request FMLA, and Perez continued to pay her salary while she was out. *Id*. at 71.

Ferro also took a couple of days off in mid-February 2020 due to abnormal blood pressure. ECF No. [36-5] at 274. Her medication had been switched and she wanted to make sure that it was working properly. *Id*. She did not request FMLA leave for that absence. *Id*. Dr. Prieto, one of the medical directors at DHCP, advised Ferro to work from home on March 16 as a result of the COVID pandemic. *Id*. 275–76.

Perez became aware of Ferro's RA in March or early April 2020. ECF No. [36-4] at 83. Ferro claims that "Perez made several comments to me about my health, including telling me that I was 'not as healthy,' []that there was 'something always wrong with [me]' and 'there was always

an issue.'" ECF No. [42-1] at 8. Perez denied saying anything to the effect that there was something always wrong with Ferro. ECF No. [36-4] at 85. Ferro did not ask anyone at DHCP to make accommodations for her disability. ECF No. [36-5] at 97. She never requested to take FMLA leave when she was at DHCP. *Id*. at 256.

### E.  Employee and co-worker complaints

Facts surrounding Ferro's performance at DHCP are hotly contested. Once the company launched, Perez described Ferro's performance as terrible. ECF No. [36-4] at 20. According to Perez, Ferro made an early mistake with provider training that cost DHCP hundreds of thousands of dollars. *Id*. at 20–21, 23, 25–28. When this happened, Perez told Ferro that he considered demoting her. *Id*. at 26–27. Perez also testified that there was high turnover of employees reporting to Ferro because of her. *Id*. at 30. Perez stated that he learned of improper staff training, no team cohesiveness, an antagonistic approach, and a lot of finger pointing. *Id*. 30-31. Perez claims to have spoken to Ferro in 2019 about these issues. *Id*. at 31.

Perez also pointed to Ferro coming in late, leaving early, not being responsive to staff, and being rude to some of the provider communities. *Id.* at 37. He testified that Ferro did not timely address complaints because they continued to come in. *Id.* at 38. Her co-workers complained that she was not a team player, that she was a liar and could not be trusted, and that she did not take accountability. *Id.* at 39. She was trained multiple times on the company operating system and continued to make the same mistakes, and she had issues with her email system, when there were no issues. *Id.* at 40. Perez testified that he did have performance issues from time to time with other DHCP employees, but not to the extent he had with Ferro. *Id.* at 57.

Perez also testified that there were provider complaints about Ferro in 2019. *Id*. Specifically, the hospital divisions from Tenet, Baptist, and HCA complained about a lack of

training and lack of in-servicing. *Id*. In addition, PrimeHealth, a physicians group, complained about the lack of training and in-servicing, which created claims issues. *Id*. According to Perez, it was Ferro's responsibility to train the hospitals, and she failed to do so. *Id*. at 32.

In January 15, 2020 meeting notes that Perez took, he wrote "Met with Julie after many meetings and discussed with her work issues in detail. Lack of accountability, responsibility, lack of team work, provider complaints, finger pointing, etc. Told her if she does not improve I will be making changes that are final. Her response was, Raf, do what you need to do." ECF No. [36-4] at 78–79.

Daniel Perez, who also worked for a time in the provider relations department under Ferro, testified about his frustrations with Ferro. ECF No. [36-16] at 14. Specifically, he recalled an instance in which Ferro gave him a directive regarding information to give to providers, which later turned out to be incorrect. *Id*. at 14. According to Daniel Perez, Ferro then denied giving him the directive. *Id*. He sometimes felt that Ferro was conniving and tried to set him up for failure. *Id*. at 18. He also remembered a meeting in which Ferro was very rude to Caleb Rojas, the president of a provider network. *Id*. He further recalled an incident with Associates Rehab, in which they needed to resolve an overpayment issue, and which ultimately resulted in the Associates Rehab representative not wanting to work with Ferro. *Id*. at 19.

Pagliery described the incident with Associates Rehab at the end of 2019, in which the system made some incorrect payments due to a configuration. ECF No. [36-10] at 61. Ferro had instructed them to bill incorrectly, which resulted in even more overpayments and underpayments. *Id*. As a result, the provider called Pagliery as they did not want to discuss with Ferro moving forward. *Id*. Pagliery also received complaints from staff about Ferro telling them to come to her with certain issues, but then being inaccessible. *Id*. at 64. Staff would then go to Pagliery, and when

Ferro found out, she would become upset. *Id*. Pagliery recalled receiving a complaint from an employee in member services about Ferro being abrasive. *Id*. at 65.

Pagliery also testified that during the time period that the provider relations department was working remotely, Ferro was inaccessible—providers, and her staff sometimes, would try to reach out to her and could not get through to her. *Id*. at 33. She also missed a couple of meetings and claimed that she had not been invited to them. *Id*. at 34. Pagliery testified that it was difficult to communicate with Ferro about certain things because she would take things personally and become defensive. *Id*. at 19. At the beginning of 2019, Pagliery raised additional issues regarding Ferro. *Id*. at 20. She testified that there was a lack of integrity with the messages that were going out to providers due to a communication disconnect, and she was worried about the information that was getting out to the network. *Id*. at 21. She raised this concern with Perez, and they had a meeting. *Id*. at 21–22. The meeting resulted in retaliation from Ferro, who was very upset, and barely spoke to or looked at Pagliery for a couple of weeks. *Id*. at 22. Eventually, they decided to put things behind them and figure out a new way to communicate moving forward. *Id*. at 23. Thereafter, Pagliery was trying to figure out a way to communicate with Ferro and manage the team on her own without having to involve Ferro as much. *Id*. at 24. According to Pagliery, Ferro was private about her health. *Id*. at 25.

Janelle Perez, who worked in the provider relations department, testified that she left the department in August 2019 because she was unhappy. ECF No. [36-13] at 11. According to her, there was a lack of leadership, and she felt that Ferro was unavailable, gave no clear guidance, was incompetent, and did not communicate well. *Id*. 11–14. Janelle Perez also complained to Pagliery that Ferro was rude and confrontational. *Id*. at 34.

Martin Perez, DHCP's CFO and later President, testified that he heard from staff members

and management personnel that Ferro was very unresponsive at times, not truthful in many situations, and that they did not trust or enjoy working with her. ECF No. [42-9] at 13–14. Janelle Perez expressed to him that Ferro did not take the time to train, educate, explain, or follow up, that she was unresponsive and unavailable at times. *Id*. at 16. Martin Perez was also aware of provider complaints with respect to Ferro. *Id*. at 18.

Ferro disputes that she had performance issues. ECF No. [42-1] at 3–6. Ferro declares that she "worked very hard to accomplish the objectives of the company, upheld the ethics of the company, and always aimed to do well by the company and Mr. Perez." *Id.* at 3. Ferro also submits that she was given a $25,000.00 raise in July 2019, with positive praises from Perez. ECF No. [42-1] at 6. Ferro similar points out that Perez awarded her a performance bonus of $10,000.00 in May 2020, *id.*, one month prior to her termination, ECF No. [36-5] at 147, 233. The letter accompanying the bonus stated that it was "[i]n appreciation for your work, dedication, and commitment to Doctors HealthCare Plans." ECF No. [43-3]. The letter also stated that "this Performance Bonus not only reflects your performance, the contributions you made, and the goals achieved on behalf of the company during the past year, but also Doctors HealthCare Plan's efforts to provide additional support for you and your family during these very difficult times." *Id.*

Ferro denies ever meeting with Perez about her performance issues or being told by him of such issues during their regular meetings. ECF No. [42-1] at 3–4. She rejects the notion that Perez brought up issues of "finger pointing, lack of accountability, coming in late, leaving early, no team building, blaming others for a mistake, not being responsive to the staff, [or] being rude to some of the provider communities." *Id.* at 4. Ferro also states that Perez did not tell her about issues with Pagliery, Janelle Perez, Daniel Perez, or others. *Id.*

Ferro continues that she got along well with providers, was often commended for her work

with them, and was never told that providers had issues with in-servicing, training, performance, responsiveness, or conduct. *Id.* at 5. Ferro describes herself as respectful and professional with providers. *Id.* at 6. Ferro also disputes the charges of improper training, stating that "specialty providers were trained according to the written Provider Manual, the member's eligibility, evidence of coverage and DHCP's policies with respect to authorizations. *Id.*

At her deposition, Ferro acknowledged receiving complaints from providers about her performance. ECF No. [36-5] at 183. But her recollection was that providers were aggravated "with the situation with claims"—therefore, she was unsure whether the complaints were "intended towards me as much as . . . towards the company." *Id.* at 183–84. But the providers "vocalized [the complaints] to [her] as an officer of the company." *Id.* at 184.

**F.  Alivi Settlement Offer**

Caleb Rojas was the President of Alivi, which was a network of podiatrists. *Id*. at 197-98. According to Ferro, there were claims submissions issues with Alivi since they joined DHCP. *Id*. at 198–99. According to Rafael Perez, the claim dispute involved approximately $300,000.00. ECF No. [36-4] at 149. Without authorization, Ferro made a settlement offer of $205,000.00 without the claims information, and without having done any research. *Id*. at 149-50. Ferro testified that at some point she remembers approaching Rojas in a phone call and exploring the possibility of considering a settlement. ECF No. [36-5] at 208. She remembers speaking to Rojas, but despite emails between the two, denies that she asked him if Alivi would entertain a claims settlement of $205,000.00 for billed charges. *Id*. at 212; *see also* ECF No. [36-15]. She testified that she was never able to verify if DHCP owed Alivi any money. *Id*. at 215.

Pagliery testified that she was involved until the point that Ferro told her that she had offered a settlement and Pagliery was no longer to respond to emails from Alivi or communicate

with them directly. ECF No. [36-10] at 38. Ferro told Pagliery it was because it was in the legal department's hands now. *Id*. at 39.

Daniel Perez, DHCP's in-house counsel, testified that he became involved in the Alivi situation after Ferro made a settlement offer, and it became a legal matter. ECF No. [36-16] at 30. He met with Rafael Perez, who was not aware at the time that Ferro had made a settlement offer, and when they called Ferro to ask, she denied making a settlement offer. *Id*. at 32-33. However, Daniel Perez testified that when he and Ferro had spoken, she told him that she had made a settlement offer. *Id*. at 38. Based on the exchanges between Rojas on behalf of Alivi and Ferro on behalf of DHCP, Daniel Perez believed there had been a settlement offer made. *Id*. at 51.

According to Perez, he called Ferro in early June 2020, and asked whether she had made a settlement offer to Alivi, which she denied. ECF No. [36-4] at 227. Ferro also denied making the offer when she met with Perez in person. *Id*. at 228. She did tell Perez that she had posed the possibility of them considering a settlement. *Id*. at 228.

In her declaration, Ferro repeats that she told Perez that she "did not make a settlement offer to Alivi, but posed to them the possibility of considering a settlement." ECF No. [42-1] at 10. Ferro views the emails between her and Rojas as not evidencing a settlement offer. *Id.* She also denies telling anyone that she made a settlement offer regarding Alivi. *Id.* at 11.

### G. Termination

Ferro was terminated on June 8, 2020. ECF No. [36-5] at 147, 233. Perez called her into his office, closed the door and asked her to sit down. *Id*. at 148. He told her that "things aren't working out." *Id*. She asked why, and he said that she was being very forgetful and then made a wave-like gesture with his hand. *Id*. Ferro declared that the gesture "represented peaks and valleys." ECF No. [42-1] at 11.  Perez told her that one of the reasons she was being fired was

because of the unauthorized settlement to Alivi, but she did not believe him. *Id*. at 233–34. Ferro maintains that the termination was a "shock" to her and several other employees and providers. *Id*. at 11–12.

According to Perez, Ferro had lied to him on the phone with Daniel Perez, DHCP's counsel, about making the settlement offer to Alivi. ECF No. [36-4] at 134. Daniel Perez and Pagliery confirmed that Ferro had made a settlement offer, which Ferro again denied in person during her meeting with Perez, and the offer was reflected in emails sent by and to Ferro. *Id*. Perez testified that he spoke to her regarding her performance issues, coming in late and leaving early, and that she had lied to him twice about Alivi. *Id*. at 135-36. He gave her the option to resign, which according to him, she accepted. *Id*. at 141.

Ferro believes she was fired because she took a couple of weeks off after her hospitalization, she was very assertive during the COVID pandemic about staying at home and watching out for her health, and that the staff should be able to do so as well. ECF No. [36-5] at 264. She testified that she was supportive of the company coming back to in-person operations but was also clear that she would be watchful over her health and take time if she needed. *Id*. She did, however, admit that she was allowed to work from home, and she did. *Id*. at 266. At some point employees were expected to be back in the office by May 26, but were also told that if they wanted to continue to work from home, they could speak to Perez, which she did. *Id*. Perez did not tell her she had to come back to the office, but she did not continue to work from home because she felt pressure to come back from Perez's demeanor toward her. *Id*. at 266-67. However, Perez testified that he had no issues with Ferro working from home. ECF No. [36-4] at 124.

### III.    LEGAL STANDARD

A court may grant a motion for summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including,
*inter alia*, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). An issue
is genuine if "a reasonable trier of fact could return judgment for the non-moving party."
*Miccosukee Tribe of Indians of Fla. v. United States*, 516 F. 3d 1235, 1243 (11th Cir. 2008) (quoting
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect
the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The
court views the facts in the light most favorable to the non-moving party and draws all reasonable
inferences in the party's favor. *Crocker v. Beatty*, 886 F.3d 1132, 1134 (11th Cir. 2018). "The mere
existence of a scintilla of evidence in support of the [non-moving party's] position will be
insufficient; there must be evidence on which a jury could reasonably find for the [non-moving
party]." *Anderson*, 477 U.S. at 252. The Court does not weigh conflicting evidence. *See Skop v.
City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell
Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden to demonstrate the absence of a genuine
issue of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant
satisfies this burden, "the nonmoving party 'must do more than simply show that there is some
metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs.*, L.L.C., 327 F. App'x
819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475
U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each
essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v.
Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party must produce evidence, going beyond
the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and

admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343.

In resolving the issues presented under Fed. R. Civ. P. 56, "the court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc.*, 802 F.2d at 1356; *see also Aurich v. Sanchez*, No. 08-80113-CIV, 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the court must not grant summary judgment." (citing *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913 (11th Cir. 1993)). Even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

Furthermore, summary judgment is inappropriate where the Court would be required to weigh conflicting renditions of material fact or determine witness credibility. *See Hairston*, 9 F.3d at 919; *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *see also Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he [or she] is ruling on a motion for summary judgment or for a directed verdict." (quoting *Anderson*, 477 U.S. at 255)); *Gary v. Modena*, No. 05-16973, 2006 WL 3741364, at *16 (11th Cir. Dec. 21, 2006) (Fed. R. Civ. P. 56 precludes summary judgment where court would be required to reconcile conflicting testimony or assess witness credibility); *Ramirez*

*v. Nicholas*, No. 13-60820-CIV, 2013 WL 5596114, at \*4 (S.D. Fla. Oct.11, 2013) ("The Court may not make the credibility determinations needed to resolve this conflict; only the jury may do so.").

## IV.   DISCUSSION

### A.  Framework for analyzing FMLA and ADA claims

Where, as here, there is no direct evidence of unlawful gender, age, or disability-based retaliation or discrimination, a plaintiff typically must show indirect evidence of retaliation using the burden-shifting framework set out in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792 (1973). *See Durley v. APAC, Inc.*, 236 F.3d 651, 655-57 (11th Cir. 2000) (applying *McDonnell Douglas* to ADA claims); *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (applying *McDonnell Douglas* to FMLA retaliation claims). "If the plaintiff makes out a prima facie case, the burden shifts to the defendant to articulate a legitimate reason for the adverse action." *Smith v. BellSouth Telecomm., Inc.*, 273 F.3d 1303, 1314 (11th Cir. 2001). "If the defendant does so, the plaintiff must show the defendant's proffered reason for the adverse action is pretextual." *Id.* Pretext means that the reason given by the employer was not the real reason for the adverse employment decision. *Wood v. Calhoun Cnty. Fla.*, 626 F. App'x 954, 956 (11th Cir. 2015). A plaintiff need not produce additional, independent evidence of discrimination to show prextext. Rather, the burden can be met on summary judgment by attacking the credibility of a defendant's proffered reasons for the adverse employment action and showing those reasons to be false. *Spakes v. Broward Cnty. Sheriff's Off.*, No. 06-61471-CIV, 2007 WL 9653286, at \*7 (S.D. Fla. Oct. 31, 2007) (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147-48 (2000)). Through this lens, the Court considers the Motion.

### i.    FMLA Retaliation

Under the FMLA, eligible employees are entitled to a total of 12 workweeks of leave during any 12-month period because of, *inter alia*, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612 (a)(1)(D). Any eligible employee who takes leave shall be entitled to restoration to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. *See* § 2614. Further, under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1). "To preserve the availability of [family and medical leave] rights, and to enforce them, the FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act[,] and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." *Shanks v. Potter*, No. CV 110-045, 2010 WL 8347107, at *5 (S.D. Ga. Dec. 28, 2010), *aff'd*, 451 F. App'x 815 (11th Cir. 2011) (quoting *Strickland*, 239 F.3d at 1206) (internal quotation marks omitted).

### a.    *Prima facie* case

To establish a *prima facie* case of FMLA retaliation, a plaintiff must show that "(1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment decision; and (3) the decision was causally related to a protected activity." *Pereda v. Brookdale Senior Living Communities, Inc.*, 666 F.3d 1269, 1275 (11th Cir. 2012). "[T]o succeed on a retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." *Strickland*, 239 F.3d at 1207 (citations omitted). As such, a plaintiff bringing a retaliation claim faces the increased burden

of showing that his employer's actions "were motivated by an impermissible retaliatory or discriminatory animus." *Id.*

Defendants argue that Ferro cannot establish a *prima facie* case of FMLA retaliation because she did not request FMLA leave at any time when she was hospitalized at the end of 2019, and that in any event, she was paid in full for the time she was hospitalized and recovering.[3] In response, Ferro contends that her hospitalization at the end of 2019 qualified under the FMLA and that she was indisputably terminated from her employment thereafter.

Upon review, although Defendants contend that Plaintiff's claim fails because she did not request FMLA leave and was fully paid during her hospitalization and recovery time, Defendants have cited no authority to support a finding that because she did not specifically request FMLA leave and was paid, her hospitalization and recovery does not qualify as statutorily protected activity. "[A] litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. The court will not do his research for him." *Melford v. Kahane & Assocs.*, 371 F. Supp. 3d 1116, 1126 n.4 (S.D. Fla. 2019) (internal quotations and citation omitted). Similarly, Defendants have not disputed that Ferro's termination constitutes an adverse employment decision. As such, Ferro satisfies the first two elements of a *prima facie* case.

The issue remaining is whether there is sufficient evidence in the record to demonstrate that Plaintiff's termination was causally related to her hospitalization. "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action. . . . But mere temporal proximity, without more, must be 'very

---

[3] Defendants also argue that Ferro's claim that they retaliated against her by reducing her pay is not supported by the record. ECF No. [35]. In response, Plaintiff appears to have abandoned this theory of retaliation, specifying that the adverse employment decision resulting from her hospitalization was her termination. *See* ECF No. [41] at 18.

close.'" *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (internal citations omitted). "The causal connection element is satisfied if a plaintiff shows that the protected activity and adverse action were 'not wholly unrelated.'" *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010) (quoting *Brungart v. BellSouth Telecomm., Inc.,* 231 F.3d 791, 799 (11th Cir. 2000)). "Generally, a plaintiff can show the two events are not wholly unrelated if the plaintiff shows that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Id*. However, the temporal proximity between the decision maker's awareness of the protected conduct and the adverse employment action must also be close. *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) ("We have plainly held that a plaintiff satisfies this element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action"); *Bechtel Constr. Co. v. Sec'y of Labor*, 50 F.3d 926, 934 (11th Cir. 1995) ("Proximity in time is sufficient to raise an inference of causation.").

Defendants argue that Ferro cannot demonstrate the necessary causal connection because, even assuming that her hospitalization was protected under the FMLA, her termination in June 2020 occurred too long after her hospitalization in December 2019. Plaintiff responds that, although she cannot rely on temporal proximity alone to establish a causal connection, the record demonstrates that Perez's repeated comments about her health issues, his increasing scrutiny, combativeness, and irritation during their interactions, and the "peaks and valleys" or wave gesture he made at the meeting when he terminated her support a finding that her hospitalization was not "wholly unrelated" to her termination.

Upon review, however, and even viewing the evidence in the light most favorable to Plaintiff, there is insufficient evidence to satisfy the element of causation. Although it is undisputed

that Rafael Perez was aware of Ferro's hospitalization when she was terminated, there is no record evidence indicating that it was Ferro's hospitalization specifically—which she has identified as the FMLA protected activity—that led to her termination nearly seven months later.

While Ferro testified that Perez made comments about her health issues, and that she felt increased scrutiny and animosity from him, she does not identify any evidence in the record to support an inference that his comments or behavior toward her arose as a result of her hospitalization. Specifically, with respect to the comments made, she testified at her deposition that

> [t]he comments, were, you know, you are getting older. You are not as healthy. You are not as pretty; just general comments like that, that once or twice it's funny. The third time you hear it, it's like, enough already.

ECF No. [36-5] at 130-31. In addition, although Plaintiff testified that Rafael Perez commented to her that something was always wrong with her related to her health, she also testified that she could not remember when he made the comment. *Id.* at 280. And, she has pointed to no other record evidence indicating that this comment was related to her hospitalization or termination, such that it could be considered anything other than a stray remark. *See Mejdoub v. Desjardins Bank, N.A.*, No. 14-CIV-62722-Bloom/Valle, 2016 WL 4369968, at *5 (S.D. Fla. Jan. 11, 2016) (finding that comments made nearly seven months before plaintiff's termination were undoubtedly inappropriate, but that the lack of temporal proximity to termination "reveal[ed] that they are appropriately determined to be stray remarks unconnected with the decision to terminate"). Similarly, with respect to the "peaks and valleys" gesture Perez made when he met with Ferro to terminate her, she testified that "he said that I was being very forgetful, and that I was like this" [making gesture]. ECF No. [36-5] at 148. Although Plaintiff has alleged that the gesture represented the ups and downs with her health issues that required her to miss work, *see* ECF No.

[10] ¶ 109, she has pointed to no other record evidence that would support an inference that the gesture Perez made was related to her health conditions.

As such, Plaintiff has failed to establish a *prima facie* case of FMLA retaliation based on her hospitalization at the end of 2019.

### ii.     ADA and FCRA discrimination[4]

Under the ADA, a plaintiff must establish the following three elements for have a prima facie case: (1) the plaintiff "has a disability"; (2) the plaintiff is a "qualified individual"; and (3) the plaintiff was discriminated against because of a disability. *Holly*, 492 F.3d at 1255-56. "If an employee makes this showing, the employer must articulate 'a legitimate, non-discriminatory reason for the challenged action.'" *Monroe*, 793 F. App'x at 926 (quoting *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001)). "Once an employer articulates such a reason, the employee must present evidence showing that the employer's proffered reason was pretextual." *Id*.

Defendants argue that Ferro cannot establish a *prima facie* case of disability discrimination because she cannot show that her condition rises to the level of a disability under the ADA. However, as Plaintiff correctly notes, Defendants rely upon case law pre-dating the ADA Amendments Act of 2008 ("ADAAA"), which became effective on January 1, 2009. "When it enacted the ADAAA, Congress indicated that one of its purposes was to 'convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.'" *Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1246, 1268 (11th Cir. 2014) (citation omitted). Moreover, the implementing regulations state that "[t]he primary purpose of the ADAAA

---

[4] The Eleventh Circuit has determined that disability discrimination claims under the ADA and FCRA are subject to the same burden-shifting analysis. *See Monroe v. Fla. Dep't of Corr.*, 793 F. App'x 924, 926 (11th Cir. 2019) (citing *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1255 (11th Cir. 2007).

is to make it easier for people with disabilities to obtain protection under the ADA," and that "the definition of 'disability' in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA." 29 C.F.R. 1630.1(c).

Under the ADA, a "disability" includes a "physical or mental impairment that substantially limits one or more major life activities of such individual . . . ." 42 U.S.C. § 12102(1)(A). Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Furthermore, the Eleventh Circuit has endorsed the Code of Federal Regulations interpretation of impairment. *See Harris v. H & W Contracting Co.*, 102 F.3d 516, 520 (11th Cir. 1996). A physical impairment is "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal . . . ." 29 C.F.R. § 1630.2(h)(1)(ii). Rheumatoid arthritis is a condition that impacts the musculoskeletal system.[5] "An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." § 1630.2(j)(1)(ii). "Major life activities" include concentrating, communicating, interacting with others, and working. § 1630.2(i)(1)(i). Significantly, the ADAAA emphasizes that "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii).

Here, viewing the evidence in the light most favorable to her, Plaintiff has presented sufficient evidence that her RA is a disability to withstand summary judgment. In pertinent part,

---

[5]   *Rheumatoid Arthritis*, Centers for Disease Control and Prevention, https://www.cdc.gov/arthritis/basics/rheumatoid-arthritis.html (last updated July 27, 2020).

Plaintiff testified there were days that she felt well, and then episodes with overwhelming fatigue, swelling of the joints, stiffness, and overreactive skin. ECF No. [36-5] at 100. Moreover, Ferro testified at her deposition that the RA impacted her ability to do her job by affecting her level of energy, and she would have episodes of vomiting in the office, general malaise, and pain. *Id*. at 102-03. Ferro also testified that she experiences periods of fogginess when she cannot concentrate as much as she would like. *Id*. at 111. RA limits her mobility in her personal life, as she used to be able to run, but she cannot anymore, and now after two miles of walking, she begins to feel pain. *Id*. at 111-12. Although Defendants suggest that Ferro's RA cannot be a disability under the ADA because it was episodic, the statute states that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D). Moreover, Defendants have cited no support stating that RA cannot be considered a disability under the ADA. *See, e.g. Caporicci v. Chipotle Mexican Grill, Inc.*, 189 F. Supp. 3d 1314, 1322 (M.D. Fla. 2016) (where defendant relied on pre-ADAAA case law and "given the lenient standards of the ADAAA," plaintiff raised a genuine issue of fact regarding whether her bipolar disorder was a disability).

Similarly, Defendant's reliance upon the doctor's note stating that Ferro could return to work with no restrictions, ECF No. [36-7], and that she was denied Social Security Disability Insurance ("SSDI") several years ago, to indicate that Ferro cannot show that she was disabled is misplaced. First, Perez testified that the doctor's note was requested by the human resources company from all employees in relation to working from home during the COVID-19 pandemic. ECF No. [36-4] at 98, 101. Thus, the doctor's note lends no support to the contention that Ferro was not disabled for purposes of the ADA. Second, given the broad interpretation of disability under the ADA, Ferro's application for SSDI more than five years before the events at issue in this

case is not persuasive. Moreover, Defendants have cited no support stating that the denial of a claim for Social Security disability benefits establishes that an individual does not have a disability under the ADA.

Defendants, however, have presented a legitimate, non-discriminatory reason for the challenged action: Ferro's poor job performance. Perez described Ferro's performance as terrible, and almost demoted her in the first quarter of 2019 when she made a costly mistake. ECF No. [36-4] at 20–21, 23, 25–28. According to Perez, Ferro was responsible for high employee turnover and provider complaints. *Id.* at 30–32. Ferro was also involved in a contentious situation where she denied making an unauthorized settlement offer, ECF No. [36-5] at 208, 212, [36-4] at 227–28, despite emails and witnesses to the contrary, ECF No. [36-10] at 38–39, [36-15]. Other employees— Pagliery, Daniel Perez, Janelle Perez, and Martin Perez—echoed the concerns regarding Ferro. *See* ECF No. [36-10] at 21–25, 33–34, 61, 64–65; [36-13] at 11, 34, 39–40; [36-16] at 14, 18–19; [42-9] at 12–18. And according to a meeting note dated January 15, 2020, Perez spoke to Ferro about her performance issues. ECF No. [36-4] at 78–79.

That being said, there is an issue of fact as to whether the proffered reason for the challenged action was a pretext. For instance, Ferro declares that she was given a $25,000 raise in July 2019, with positive praises from Perez. ECF No. [42-1] at 6. Ferro similar states that Perez awarded her a performance bonus of $10,000 in May 2020, *id.*, with a glowing note about her performance, ECF No. [43-3]. Ferro further denies ever meeting with Perez about her performance issues or being told by him of such issues during their regular meetings. ECF No. [42-1] at 3–4.

In addition, Ferro claims that Perez made several comments to her about her health in the months preceding her termination, *id.* at 8, which Perez disputes, ECF No. [46] at 4. Ferro continues to deny that she made an unauthorized settlement offer. ECF No. [42-1] at 10–11. The

email purportedly referencing the settlement offer, does not, in and of itself, represent conclusive proof of an offer, as opposed to ongoing settlement discussions. *See* ECF No. [46-15]. Finally, Ferro denies that Perez told her that she was being let go because of performance issues, ECF No. [42-1] at 11–12, which Perez disputes, ECF No. [46] at 5.  Ferro has set forth evidence that attacks the credibility of DHCP's proffered reasons as pretextual, precluding judgment as a matter of law. *See Barthelus v. G4S Gov't Sols., Inc.*, 752 F.3d 1309, 1317 (11th Cir. 2014) (reversing summary judgment where "material issues of fact [were] present regarding pretext," such as positive performance reviews).

Accordingly, Defendants have failed to demonstrate that they are entitled to summary judgment upon Plaintiff's claim for disability discrimination.

## V.   CONCLUSION

For the foregoing reasons, Defendants' Motion, **ECF No. [35]**, is **GRANTED IN PART AND DENIED IN PART**. Defendants are entitled to summary judgment upon Plaintiff's claims for FMLA retaliation (Count 1) and age discrimination (Count 3). The Motion is denied with respect to Plaintiff's ADA and FCRA discrimination claim (Count 2).

**DONE AND ORDERED** in Chambers at Miami, Florida, on November 18, 2021.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record